NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0042n.06

Case No. 25-3296

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Jan 22, 2026
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| WENDY F. DAVIS, | ) | |
| Plaintiff-Appellant, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| v. | ) ) | |
| UNIVERSITY OF TOLEDO, | ) | |
| Defendant-Appellee. | ) ) ) | OPINION |

Before: KETHLEDGE, BUSH, and NALBANDIAN, Circuit Judges.

**NALBANDIAN, Circuit Judge.** Wendy Davis took the helm of a troubled Human Resources Department at the University of Toledo. She clashed with her supervisor and fell short of expectations in several areas. Eventually, the University fired her because of her job performance. But Davis doesn't see things that way. So she sued the University, alleging that it spun up a pretext to fire her because of her race and to punish her for speaking out about racial issues in the workplace. The district court disagreed and granted summary judgment to the University. Now Davis appeals. But we agree with the district court, so we AFFIRM.

**I.**

Davis, who is Black, worked in the University's Human Resources (HR) Department for five years. She first served as Director of Human Resources for Academic Administration and Student Services. A year later, the University promoted her to a similarly wordy position: Interim Associate Vice President of Human Resources and Talent Development. Then, another

promotion:  the University removed her "interim" status.  With that, Davis assumed the role at the heart of this case—though the University later changed her title to Chief Human Resource Officer (CHRO).

Davis had reached HR's commanding heights.  As CHRO, she managed the entire department.  That covered recruitment, compensation, benefits administration, training, labor relations, and disability and leave administration.  She supervised seven employees directly and another forty or fifty indirectly.  And she was an "appointing authority" for the University, so she wielded hiring and firing power.  R.36-4, Summary, PageID 1147.

But there's always a bigger fish.  The CHRO reports to the Executive Vice President for Finance—effectively the University's chief financial officer.  Midway through Davis's tenure as CHRO, Matt Schroeder took over as financial chief and became Davis's boss.  Schroeder gave Davis an annual performance evaluation.  It was positive.  Davis "[f]requently [e]xceed[ed]" general expectations and performed as expected in specific categories.  R.38-18, Evaluation, PageID 1631.  Overall, she "met expectations."  *Id.* (cleaned up).

Soon after the performance review, however, challenges cascaded in HR and across departments.  The University was in dire financial straits, and Schroeder demanded much of Davis (and others).  These challenges strained Davis's relationship with Schroeder.  But Davis failed to meet the moment, including failing at tasks fundamental to her job, so Schroeder fired her.  We'll briefly summarize these events.

First, HR failed to comply with federal immigration laws.  Davis directed an audit of the University's compliance with the Immigration Reform and Control Act (IRCA), which requires employers to collect and retain I-9 forms. The results were troubling.  In one sample, a fifth of the employees lacked I-9s.  In another, a third.  [*Id.*]  That exposed the University to potential seven-

2

figure fines. To her credit, Davis came up with a solution. She suggested that the University expand its use of Intellicorp, a background check vendor, to process and review I-9s as well. Davis says that Schroeder shot down her suggestion, but Schroeder doesn't recall doing so. In any event, the University began using Intellicorp for I-9 review after Davis's termination.

Second, HR dropped the ball on renegotiating the University's collective bargaining agreement (CBA) with its unionized security personnel. Labor relations is HR's bread and butter—the University had listed it as a "human resources functional area" in Davis's job description. R.36-4, Summary, PageID 1147. Naturally, HR took the lead on renegotiating the CBA. But the University's head of labor relations abruptly left while HR was in the "thro[e]s of negotiation." R.36, Davis Dep. Tr. Vol. I, PageID 1073. So Lisa Simpson, Davis's direct subordinate, took over the negotiations. Davis instructed Simpson to calculate the final cost of the proposed CBA to ensure it fit the University's financial parameters. Simpson told Davis that she completed that crucial step—but she didn't. Instead, Simpson and the union signed a tentative agreement that broke the bank.

And there was another problem. As Davis explained, "if we go back to the table, then . . . we would be engaging in regressive bargaining"—which might violate federal labor laws. R.36, Davis Dep. Tr. Vol. I, PageID 1074. Luckily, Davis and the department caught a break: the union agreed to renegotiate. But the revised CBA had its issues, too. Schroeder concluded that "what was being offered to the union was . . . out of line with other" CBAs. R.38, Schroeder Dep. Tr., PageID 1455. He summarized the issues with the "proposed economics" in a curt email. R.36-8, Email Exchange, PageID 1174. The upshot was that Schroeder couldn't take either agreement to the Board for final approval. Davis admitted she "[p]robably" bore responsibility for the fiasco because Simpson "was a part of HR, and I'm over HR." R.36, Davis Dep. Tr. Vol. I, PageID 1083.

Third, the University discovered inadequacies with its Family and Medical Leave Act (FMLA) compliance—an HR domain. The shortfalls included a lack of a standard procedure for FMLA leave and incorrect hiring dates on the FMLA application system. An audit report concluded that "internal controls need improvement" and provided recommendations. R.36-15, FMLA Audit Report, PageID 1187. It stressed that the University risked liability or noncompliance. So the report called on Davis to "implement all corrective actions" within a year. *Id.* at PageID 1188.

Fourth, HR was failing to fill positions at the University's Medical Center. The Medical Center maintained a 10% vacancy rate and faced a decrease in job applications. And HR was floundering. The Medical Center's leadership expressed dismay at the "length of time it took to have open positions posted, . . . whether . . . applicants were reviewed by hiring managers, and [a lack of] prompt responses from [HR] staff." R.38-4, Schroeder Aff., PageID 1595. So its CEO complained to Davis about HR's lethargic pace. HR's delays, he explained, caused the Medical Center to lose applicants altogether.

Fifth, Davis's tenure spurred departures. Four of Davis's seven direct reports left the University in just over a year. Schroeder met with three of them. And they all voiced the same concerns with Davis: "micro-managing," a "lack of decision making," and "overall low morale." R.38, Schroeder Dep. Tr., PageID 1525. Two of these employees also aired their grievances in emails to Schroeder. In sum: a "lack of flexibility" and "respect," as well as a "tense" environment, drove these employees to give up. R.36-16, Gaus Email, PageID 1193; R.36-19, Pack Email, PageID 1197 (citation modified).

After this series of failures, Schroeder told Davis that he was going to request an external review of HR's operations.

4

This wasn't uncharted territory for the University—Schroeder had recently probed another department. And in a case of "who watches the watchmen," it was the auditing department itself. Of course, Davis didn't run the auditing department. But this story fits into our anthology because its protagonist *wasn't* fired, and Davis thinks that's relevant. Here's what happened. The University conducted an external quality assessment and concluded that the auditing department failed to "generally conform[]" to internal auditing standards. R.38-13, Memorandum, PageID 1612. The department head, David Cutri, a White man, also reported to Schroeder. Schroeder formally reprimanded Cutri and placed him on a performance improvement plan (PIP). The PIP identified areas of improvement and called for one-on-one meetings so that Schroeder could monitor Cutri's progress. Cutri improved. In Schroeder's words, he "ended up working through the PIP in a very efficient manner." R.38, Schroeder Dep. Tr., PageID 1556. So Schroeder didn't fire him.

Back to Davis. The HR situation came to a head when Davis told Schroeder that she was considering resigning. She told him that she was frustrated because he had denied her the resources she needed to "run the department." R.37, Davis Dep. Tr. Vol. II, PageID 1285. She also told him that she "wanted to stick in there" to "finish what [she] started" because her predecessor had left the HR Department in a sorry state. *Id.* at PageID 1287. But Schroeder considered Davis's remark about resignation to be "a pretty big deal." R.38, Schroeder Dep. Tr., PageID 1497. So he resolved to fire her.

Schroeder began searching for Davis's replacement. The University's President introduced him to Melissa Hurst and John Elliott, both of whom the President knew from prior jobs. Hurst and Elliott are White. By this time, Schroeder had concluded that "the next chapter of HR . . . did not involve" Davis. R.38, Schroeder Dep. Tr., PageID 1495. So he hired Elliott as

5

CHRO and Hurst as Executive Director of Talent Strategy and Development, both at higher salaries than what Davis had earned. There was only one thing left to do. After consulting with the President and with the Legal Department, Schroeder fired Davis.

## II.

So Davis acted. First, she filed an administrative charge with the Ohio Civil Rights Commission (OCRC) asserting discrimination based on race and sex. Then she filed an amended charge adding age discrimination. In her charges, Davis alleged that Schroeder and the University sabotaged her job performance because of her race. She didn't mention retaliation. The OCRC issued a Letter of Determination, in which it found that the University had "probabl[y]" discriminated against Davis based on race, but not on the other grounds. Letter in hand, Davis sued the University. She alleged discrimination based on race under 42 U.S.C. §§ 1981 (right to contract) and 2000e-2 (Title VII), and unlawful retaliation under both statutes. She also sought an award of attorney's fees under 42 U.S.C. § 1988. Davis voluntarily dismissed her § 1981 claims, and the district court granted the University's motion for partial judgment on the pleadings for the § 1988 claim. That left the Title VII discrimination and retaliation claims.

The University moved for summary judgment on these two claims. The parties agreed that Davis could establish a prima facie case of race discrimination. And they agreed that the University had articulated a nondiscriminatory reason for firing her: performance deficiencies. So the case turned on pretext.

The district court ruled for the University. To start, the district court observed that the University faced a budget crunch. So it was hardly surprising that Davis didn't receive all the resources she asked for. The district court saw a long-term trend—declining enrollment and multiyear budget cuts—not an effort to sabotage Davis's work. And it saw no effort by Schroeder

to single Davis out for negative treatment. At most, the district court concluded, Davis faced limited resources and sometimes clashed with her supervisor because he didn't adopt her ideas. Hardly out of the ordinary. Davis pointed to two Black HR employees—who were also fired—as evidence of pretext. But the court concluded that her assertions were "bare," so they didn't move the needle. Davis also raised Cutri as a comparator. Again, the district court wasn't convinced. It observed that the University didn't have a formal progressive discipline policy and that Davis wasn't entitled to a PIP before dismissal. And it contrasted Cutri's quick improvement with Davis's longstanding performance deficit. On the retaliation claim, the district court concluded that Davis didn't exhaust her administrative remedies at the OCRC.

Davis now appeals. On her view, the district court erred in granting summary judgment to the University on her race discrimination and retaliation claims. We disagree.

## III.

A district court grants summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review summary-judgment grants de novo and draw all reasonable inferences for the nonmoving party. *Walden v. Gen. Elec. Int'l, Inc.*, 119 F.4th 1049, 1056–57 (6th Cir. 2024). But we "won't accept mere conjecture and speculation." *Patterson v. Kent State Univ.*, 155 F.4th 635, 644 (6th Cir. 2025). Rather, the nonmoving party "must present significant probative evidence putting the material facts in doubt." *Walden*, 119 F.4th at 1057 (citation modified). When a district court grants summary judgment, we can affirm "on any grounds supported by the record and raised below." *Patterson*, 155 F.4th at 644.

## A.

Title VII of the Civil Rights Act makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of" that individual's "race." 42 U.S.C. § 2000e-2(a). Plaintiffs can prove discrimination with direct or circumstantial evidence. *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 302 (6th Cir. 2016). Direct evidence "consists of facts that, if believed, require the conclusion that unlawful discrimination was at least a motivating factor." *Id.* (citation modified). Circumstantial evidence is indirect—it gives rise to an *inference* of discrimination but doesn't compel that conclusion. *Patterson*, 155 F.4th at 644–45.

Davis bases her race discrimination claim solely on circumstantial evidence.

We analyze circumstantial evidence of discrimination under the familiar *McDonnell Douglas* framework. *McNeal v. City of Blue Ash*, 117 F.4th 887, 895 (6th Cir. 2024) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–06 (1973)). First, a plaintiff must make out a prima facie case of discrimination. She must show that she (1) is a member of a protected class, (2) suffered an adverse employment action, (3) was qualified for the position she held, and (4) was treated differently than a similarly situated person *not* in her protected class. *Patterson*, 155 F.4th at 645. Then the burden of production shifts to the defendant, who must "identify a legitimate, nondiscriminatory reason for its actions." *Id.* If the defendant succeeds, the burden "shifts back to the plaintiff to offer evidence that the employer's justification is pretextual." *Id.*

The University concedes that Davis has made out a prima facie case. And Davis concedes that the University articulated a legitimate, nondiscriminatory reason for firing her. So this case turns on pretext.

A plaintiff can show pretext by taking three well-worn paths. First, she can show "that the proffered reasons had no basis in fact." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir.

2009). Second, that "the proffered reasons did not actually motivate the employer's actions." *Id.* Or third, that the proffered reasons "were insufficient to motivate the employer's actions." *Id.* The categories are a "convenient way of marshaling evidence," but "at bottom the question is always whether the employer made up its stated reason." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012).

Davis makes two main pretext arguments. First, she contends that Schroeder and the University sabotaged her job performance by withholding money and by stonewalling her proposals. This argument sounds like a "did not motivate" theory. *See Chen*, 580 F.3d at 400. Second, she props up Cutri as a comparator to argue that her performance issues didn't warrant termination. This argument sounds like an "insufficient motivation" theory. *See id.* But Davis hasn't carried her burden under either theory.[1]

**i.**

We'll start with the "did not motivate" theory. Davis casts herself as the victim of a conspiracy to suggest that Schroeder and the University orchestrated her performance issues. But the evidence doesn't bear that out.

---

[1] Davis makes two other arguments, but they're underdeveloped. First, she claims that the University offered a White employee a different position with no change in pay but terminated two Black employees without offering the same deal. It's true that "evidence of discrimination by the employer against non-party employees" can be probative of pretext. *Griffin v. Finkbeiner*, 689 F.3d 584, 598 (6th Cir. 2012). But Davis must explain how these firings were "logically or reasonably tied to" her termination. *Id.* And she hasn't. She offers only a bare "assertion that other employees might be able to establish a prima facie case." *Johnson v. Interstate Brands Corp.*, 351 F. App'x 36, 41 (6th Cir. 2009) (citation modified). That's not enough. *Id.* Second, she argues that the district court erred because it didn't credit the OCRC's cause determination. She's wrong. A "cause determination carries an evidentiary value of practically zero." *EEOC v. Ford Motor Co.*, 1996 WL 557800, at *10 (6th Cir. Sept. 30, 1996). That's because a district court can consider the evidence on which the agency relied. *Id.* The district court did so here. So it didn't need to credit the OCRC's determination.

First, although Davis acknowledges the University's "budgetary issues," she contends that the University's distribution of resources amounted to "sabotage." Appellant Br. at 43–44. We see nothing of the sort. The University had cut the HR budget for four or five years before Davis's termination, and Schroeder explained that declining enrollment drove ongoing budget cuts. The University was tightening its belt, and Davis doesn't point to any evidence that the University targeted her by starving HR of resources. So she falls back on her prima facie case by pointing to her "Caucasian successors." Appellant Br. at 45. But that doesn't cut it. *See Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1085 (6th Cir. 1994) (absent evidence which "directly challenges the credibility of [an] employer's proffered explanations," a plaintiff "must introduce some evidence of . . . discrimination other than [her] prima facie case").

Second, Davis points to a number of ideas, like outsourcing I-9 processing and changing the FMLA system, that Schroeder allegedly rejected to manufacture her removal. She mostly focuses on her I-9 recommendation because the University ultimately adopted it. Davis's I-9 suggestion was apparently a good idea, and the University vindicated her. But she loses sight of the forest for the trees. The University hired Davis to modernize HR through decisive action—not just to present occasional ideas (even good ones). Her focus on the I-9 recommendation ignores the cascade of unforced errors she committed in her role and her failure to fulfill core job requirements.

Ideas aside, her *performance* left much to be desired. To wit: IRCA noncompliance, a botched CBA renegotiation, FMLA vulnerabilities, costly hiring delays at the Medical Center, and a string of departures in the HR Department. Davis doesn't point to any evidence that Schroeder froze her out by spitefully rejecting her ideas. That's because there isn't any. But there's plenty of evidence that she failed in her responsibilities on her own. So her termination wasn't pretextual.

10

*See Chen*, 580 F.3d at 401–02 (rejecting the plaintiff's pretext argument because poor performance was "the only explanation for [plaintiff's] termination that [was] supported by the record" given plaintiff's "eighteen-month history of performance problems, including two failed performance audits . . . and a history of . . . conflicts with coworkers").

**ii.**

Next, we'll turn to Davis's "insufficient motivation" theory involving Cutri as an alleged comparator. This theory fails, too. Cutri's performance problems weren't as severe or longstanding as Davis's. That's why Cutri received a PIP and Davis didn't.

To show pretext, a plaintiff can point to a comparator outside her protected class. *Tennial*, 840 F.3d at 303–04. Comparators must be "similar in all relevant respects." *Bashaw v. Majestic Care of Whitehall, LLC*, 130 F.4th 542, 551 (6th Cir. 2025). That means they must have reported to the same boss and been subject to the same standards. *Goldblum v. Univ. of Cincinnati*, 62 F.4th 244, 255 (6th Cir. 2023). And comparators must "not [have been] fired even though they engaged in the same or similar conduct." *Bashaw*, 130 F.4th at 551.

Davis is correct that, as another head of a department, Cutri occupied a similar role: he reported to Schroeder and was subject to the same University standards. But he didn't engage in the same conduct as Davis, so he isn't a proper comparator. Cutri's department failed a single quality assessment. And for that, Schroeder took him to task with a stern reprimand and a PIP. Cutri quickly improved. As for Davis? Her department arguably failed *two* audits—one abysmally. Not to mention the bargaining fiasco, the hospital delays, and the fact that HR was hemorrhaging employees (who complained about Davis). There's just no comparison. *See Gunn v. Senior Servs. of N. Ky.*, 632 F. App'x 839, 848 (6th Cir. 2015) (employees not similarly situated

11

because purported comparator ran deficits but cut them "considerably," whereas plaintiff presided over a "growing deficit" and "fail[ed] to establish a sustainable business model").

Davis also accuses the University of failing to follow its policies by offering a PIP only to Cutri. We'll note at the outset that "an employer's failure to follow self-imposed regulations . . . is generally insufficient to support a finding of pretext." *White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 246 (6th Cir. 2005). Regardless, University policy didn't require a PIP to terminate at-will employees like Davis. Instead, while the University retained "discretion" to progressively discipline them, it also had "sole discretion" to "suspend[] or terminate[]" them. R.38-15, Policy, PageID 1624. So the University didn't fail to follow its discipline policy. It soundly exercised its discretion by firing a chronic underperformer (Davis) while sparing a one-off straggler (Cutri).

**B.**

On to retaliation. Davis contends that Schroeder retaliated against her for "resisting discrimination." Appellant Br. at 57. But because she didn't exhaust this claim before the OCRC, we affirm the district court's grant of summary judgment.

To make out a prima facie case of retaliation, a plaintiff must demonstrate that (1) she engaged in protected activity, (2) the defendant knew of that activity, (3) the defendant took a "materially adverse" action, and (4) a causal connection exists between the protected activity and the adverse action. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). After that, we follow the familiar *McDonnell Douglas* framework. *Id.*

But Title VII requires that a plaintiff first file an administrative charge with the EEOC or certain state agencies before filing suit. *See* 42 U.S.C. § 2000e-5(b), (c). So "[a]s a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in [her] . . . charge." *Younis v. Pinnacle Airlines, Inc.*, 610 F.3d 359, 361 (6th Cir. 2010). That's because employers

12

should have information about the complained-of conduct, and agencies should get the chance to "settle the dispute." *Id.* at 361–62. "Hence, allowing a Title VII action to encompass claims outside the reach of . . . charges would deprive the charged party of notice and would frustrate [agencies'] investigatory and conciliatory role." *Id.* at 362.

Recall that Davis didn't mention retaliation in her original or amended charges. Davis did allege later that Schroeder retaliated against her for documenting his deficiencies in hiring "minorities and females." R.43-2, Position Statement, PageID 1694–95. But that was only in a subsequent position statement she submitted to the OCRC.

To be sure, we haven't foreclosed the possibility that a post-charge letter could amend an administrative charge for purposes of exhaustion. *Hayes v. Clariant Plastics & Coatings USA, Inc.*, 144 F.4th 850, 866 (6th Cir. 2025) (declining to resolve the issue because the claim is time-barred). Though we've come close. *See id.* (noting that "some of our sister circuits" have so concluded because, among other reasons, it would be "illogical" to construe a letter to an agency as providing notice to a party). And several district courts in our Circuit have said as much. *See, e.g.*, *Krstovska v. Staunton Fin., Inc.*, 2025 WL 1524456, at *3 (E.D. Mich. May 27, 2025) ("The expected scope of the . . . investigation is determined by the allegations in the charge itself, rather than those contained in responsive documents."); *Tobias v. Terex, USA Inc.*, 2022 WL 3686423, at *9 (E.D. Mich. Aug. 25, 2022) ("[T]he *charge of discrimination* [is] the guiding document.").

But Davis doesn't argue that the letter amended her charges.[2] She only contends that her retaliation claim "grow[s] out of" her charges. Appellant Br. at 57. We disagree.

---

[2] Davis made this argument before the district court, but made only a passing reference to her letter on appeal. And she didn't explain how that letter modified her charges. So she forfeited the argument. *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (parties give up "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation" (citation modified)).

We've loosened the charge-filing requirement to allow claims "reasonably expected to grow out of" the agency's investigation into the charge. *Davis v. Sodexho, Cumberland Coll. Cafeteria*, 157 F.3d 460, 463 (6th Cir. 1998). One reason is because facts related to the originally charged claim might prompt an agency to "investigate a different, uncharged claim." *Younis*, 610 F.3d at 362 (quoting *Davis*, 157 F.3d at 463).

Davis hasn't shown that a retaliation claim grew out of her original or amended charge. Neither charge mentioned Davis's documentation of discriminatory hiring practices or any discussion she had with Schroeder about that topic. Instead, Davis used the charges to describe *her* alleged mistreatment: the "budget cuts," the "sabotage," and the "excessive scrutiny." R.37-1, Charge, PageID 1310; R.37-2, Amended Charge, PageID 1312. No speaking out about hiring practices or anything else. So while the charges put the OCRC on notice of potential discrimination against Davis, they didn't provide notice of retaliation. *Younis*, 610 F.3d at 363 ("[T]here is nothing in the narrative portion of the EEOC charge that could be interpreted as claiming retaliation, nor is there any language that would have put the EEOC or the employer on notice that [plaintiff] was alleging retaliation."); *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 254 (6th Cir. 1998) (affirming dismissal where, in her charge, plaintiff did not "describe[] anything that indicates that she might have a retaliation claim").

## IV.

For these reasons, we AFFIRM.