RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0169p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

ERIC NOBLE,

*Plaintiff-Appellant*,

*v.*

CINCINNATI & HAMILTON COUNTY PUBLIC LIBRARY;
PAULA BREHM-HEEGER, in her individual capacity;
BOARD OF TRUSTEES OF THE CINCINNATI & HAMILTON
COUNTY PUBLIC LIBRARY; KYLA HARDIN, in her
individual capacity; MONICA DONATH KOHNEN, in her
individual capacity; ELIZABETH H. LAMACCHIA; KAREN
R. CLEMONS; NADINE L. ALLEN, in her individual
capacity; ROBERT G. HENDON, in his individual capacity;
GREGORY W. OLSON, in his individual capacity; DIANE
CUNNINGHAM REDDEN, in her individual capacity,

*Defendants-Appellees*

No. 23-3853

───────────────

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:20-cv-00594—Michael R. Barrett, District Judge.

Argued: June 13, 2024

Decided and Filed: August 9, 2024

Before: SUTTON, Chief Judge; McKEAGUE and BUSH, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Matthew S. Okiishi, FINNEY LAW FIRM, LLC, Cincinnati, Ohio, for Appellant.
Felix J. Gora, RENDIGS, FRY, KIELY & DENNIS, Cincinnati, Ohio, for Appellees. **ON
BRIEF:** Matthew S. Okiishi, FINNEY LAW FIRM, LLC, Cincinnati, Ohio, for Appellant.
Felix J. Gora, Megan E. Mersch, RENDIGS, FRY, KIELY & DENNIS, Cincinnati, Ohio, for
Appellees.

BUSH, J., delivered the opinion of the court in which McKEAGUE, J., joined.
SUTTON, C.J. (pp. 14–16), delivered a separate dissenting opinion.

—————————

**OPINION**

—————————

JOHN K. BUSH, Circuit Judge.  In 2020, during protests led in part by the organization known as Black Lives Matter (BLM), plaintiff Eric Noble made the mistake of sharing an insensitive meme on his personal Facebook page.  Only his Facebook friends, who numbered less than 100, could see his posting.  He took down the meme less than 24 hours after it went up and after his mother had advised that he do so.  But it was too late.  Some of Noble's Facebook friends who worked with him at the Cincinnati and Hamilton County Public Library ("the Library") saw the post.  They complained to the Library.  After an investigation, Noble's bosses did not think his quick removal of the meme was good enough that he should be forgiven.  Instead, the Library terminated his employment as a security guard.

There is no evidence that anyone outside the Library ever saw Noble's short-lived meme, and there is no proof in the record that he ever did anything at his job, either before or after the unfortunate post, to cause trouble with his co-workers or Library patrons.  Noble alleges that the Library's termination of his employment violated his First Amendment rights.  We agree.  We reverse the district court's grant of summary judgment for the defendants and remand with instructions for summary judgment to be entered in favor of Noble on his First Amendment retaliation claim.

**I**

Noble had worked for over two years as a Library security guard.  In that role, he helped secure the Library for patrons and staff.  His job responsibilities included "diffus[ing] situations" with patrons, "[d]iscuss[ing] infractions or violations with customers . . . and escort[ing] customers from premises if necessary," and securing staff from "unusual incidents," like "deescalating situations with customers [and] being a presence in the event of threats against staff."  Library Security Guard Position Description, R. 11-8, PageID 479.  The Library's workplace harassment policy, which Noble signed, required that employees "maintain a working environment that encourages mutual respect, promotes civil and congenial relationships among

staff members and is free from all forms of harassment and violence." Library Harassment Policy, R. 11-7, PageID 478.

Prior to the Facebook post at issue, no one at the Library had ever expressed any concern about Noble's work performance or his ability to do his job. Nothing in the record indicates that he had failed to perform his duties as a security guard or that he had harassed anyone or engaged in any disruptive behavior while on or off the job. Apparently, though, Noble's politics were not the same as those of some of his colleagues.

That became evident in 2020, following the deaths of George Floyd and others. At that time, the United States experienced extensive protests in support of BLM. *See* Larry Buchanan *et al.*, *Black Lives Matter May Be the Largest Movement in U.S. History*, N.Y. Times (July 3, 2020), https://www.nytimes.com/interactive/2020/07/03/us/george-floyd-protests-crowd-size.html. Many people approved of BLM's protest methods, but many did not because of the alleged violence and destruction and looting of property associated with them. *See* Geoffrey Skelley, *How Americans Feel About George Floyd's Death and the Protests*, FiveThirtyEight (June 5, 2020, 5:58 AM), https://fivethirtyeight.com/features/how-americans-feel-about-george-floyds-death-and-the-protests/ (citing contemporary polling data to explain Americans' "mixed views" on the protests).

The first BLM protests nationwide began on May 26, the day after Floyd's death. Derrick Bryson Taylor, *George Floyd Protests: A Timeline*, N.Y. Times (Nov. 5, 2021), https://www.nytimes.com/article/george-floyd-protests-timeline.html. That day, at home while not working, Noble shared the following meme on Facebook:



Noble's Facebook profile identified himself as a public safety officer with the Library.

As is evident, the meme contained no racial epithets. But it began with a shocking message—"ALL LIVES SPLATTER"—which was a crude word play on the message "All Lives Matter," which in turn had been used by some BLM opponents as a slogan in response to BLM's "Black Lives Matter" message. *See* Simon Goodman, *et al.*, *All Lives Matter Discussions on Twitter: Varied Use, Prevalence, and Interpretive Repertoires*, J. Cmty. & Applied Soc. Psych., Jan. 23, 2024, at 1 ("All Lives Matter (ALM) has emerged as a response to, and critique of, the Black Lives Matter (BLM) anti-racist movement."). The meme ended with an expression of apathy towards BLM activities—"NOBODY CARES ABOUT YOUR PROTEST"—and also included the offensive graphic of a vehicle running over protestors. But there is no evidence that Noble literally wanted "lives" to "splatter" or for a vehicle to run over any protestor. Noble maintained—and the Library does not seriously dispute—that the meme conveyed only hyperbole, albeit a highly offensive message.

The meme did not originate with Noble. Apparently, it was designed by someone else, and he shared it without comment from the Facebook page of another person. Indeed, this meme

appears on a variety of internet sites, including on-line sellers of t-shirts and other paraphernalia bearing it as a logo. *See, e.g.*, Bucktee, https://bucktee.com/product/all-lives-splatter-nobody-cares-about-your-protest-shirt (last visited Aug. 8, 2024).

Noble kept the meme on his Facebook page for less than 24 hours. He took it down before anyone in the Library contacted him about it. His reason for removing it? Apparently because his mother had asked him to do so, and he had the good sense to listen to her. Also, Noble had limited his Facebook settings to allow only his Facebook friends to see his posts. He likely had only between 50 and 100 Facebook friends, less than two dozen of whom were affiliated with the Library.

But that limited dissemination was enough to catch the attention of people who worked at the Library and supported BLM. Library manager Ella Mulford and other library employees attended Cincinnati's first BLM protests the weekend after Noble did his posting. Several employees sent screenshots of the meme to Mulford, who then shared the meme and her concerns about Noble's post with Kyla Hardin, the Human Resource Director, on June 1, the Monday following the protest Mulford attended. On June 2, Noble met with his manager, Wei Liu, and human resources manager Michelle Matthews. During that meeting, Matthews confirmed with Noble that he had reposted the meme. Matthews told him that someone had taken offense at the meme. When asked why he reposted it, Noble said that he thought the meme "was funny." Noble Dep., R. 11, PageID 413. Matthews did not. She placed him on leave pending an investigation into whether the meme had violated the Library's harassment policy.

Matthews then interviewed several Library employees as part of her investigation. They expressed disappointment with Noble's post and apprehension about how the post affected the Library, including how members of the public might perceive it. But Mathews uncovered no evidence that any patron of the Library had seen the post. And, to the extent that the post spread to other Library employees beyond Noble's handful of Facebook friends, the sharing apparently was done entirely by those who complained about the meme, not Noble himself.

Also, the investigation uncovered no proof that Noble had shared the meme in order to harass any patron or colleague at the Library. Indeed, there is no evidence that when Noble

reposted the meme, he even knew that any of the Library staff would participate in the BLM protests later that week.

During this period, the Library itself did not remain neutral on the merits of the protests. Instead, it actively supported the BLM movement. The Library changed its Facebook profile to a solid black image and, when Facebook commenters asked the meaning behind the change, the Library stated in a Facebook comment that "Our Library stands in solidarity against the systems of oppression and racism that routinely lead to the loss of Black life, such as the murder of George Floyd, Ahmaud Arbery, and countless others." Brehm-Heeger Dep. Ex. A, R. 8-1, PageID 93. The Library's Director also published a letter expressing the Library's support for the BLM protests: she condemned the "senseless deaths of George Floyd, Breonna Taylor, Ahmaud Arbery, and the many other Black lives in America" and promised to promote "a more equitable future." Brehm-Heeger Dep. Ex. B, R. 8-2, PageID 94–96. There is no evidence that Library's support of BLM was part of its government mission to lend books and provide other services. Nor is there proof that the Library allowed anyone to express any opinion contrary to the political messages expressed on the Library's website.

The Library fired Noble on June 10. His termination letter stated that his Facebook post violated the Library's harassment policy and "caused the Library's management, [his] manager, and [his] coworkers to lose confidence that [he] can fairly and appropriately wield" his authority as a Library security guard. Noble Termination Letter 1, R. 9-12, PageID 223. It also noted that, as a result, Noble could "do significant harm to the Library's relationship with the diverse communities that [the Library] serve[s]." *Id.*

Noble sued the Library and several others, asserting that the defendants terminated him for exercising his First Amendment right to free speech. To remedy this alleged constitutional violation, he sought damages under 42 U.S.C. § 1983 and a declaratory judgment under 28 U.S.C. § 2201, *et seq.*, that the defendants acted unconstitutionally. The parties cross-moved for summary judgment. The district court granted the defendants' motion for summary judgment and denied Noble's competing motion, holding that the Library's actions did not violate Noble's First Amendment rights as a public employee. Noble timely appealed.

**II**

We review a grant of summary judgment de novo. *Morgan v. Trierweiler*, 67 F.4th 362, 366 (6th Cir. 2023). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In this analysis, the court "must view all the evidence and draw all reasonable inferences in the light most favorable to the non-moving party." *Rhinehart v. Scutt*, 894 F.3d 721, 735 (6th Cir. 2018) (citing *Anderson*, 477 U.S. at 255).

**III**

To prevail on his First Amendment retaliation claim, Noble must show that "(1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) . . . the adverse action was motivated at least in part by his protected conduct." *Bennett v. Metro. Gov't of Nashville & Davidson Cnty.*, 977 F.3d 530, 537 (6th Cir. 2020) (cleaned up). As a public employee, whether his speech was constitutionally protected under the first element depends on a "three-prong test." *Myers v. City of Centerville*, 41 F.4th 746, 760 (6th Cir. 2022). First, the employee must have spoken as a private citizen, not pursuant to his official duties. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). Second, the speech must address a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 142 (1983). And third, the employee's interests in speaking on matters of public concern must outweigh the state's interest, "as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968). Because it is undisputed that Noble "spoke," through reposting the meme, as a private citizen, we address only the second and third prongs of this test.

**A.  Noble Spoke on a Matter of Public Concern**

"To determine whether speech involves a matter of public concern, we look to the 'content, form, and context of a given statement, as revealed by the whole record.'" *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021) (quoting *Connick*, 461 U.S. at 147–48). "When speech relates 'to any matter of political, social, or other concern to the community,' it addresses a matter of public concern." *Id.* (quoting *Connick*, 461 U.S. at 146). And the speech must "focus" on public issues, *Rodgers v. Banks*, 344 F.3d 587, 600 (6th Cir. 2003), not just private interests, *Farhat v. Jopke*, 370 F.3d 580, 593 (6th Cir. 2004).

Noble spoke on a matter of public concern. His reposted meme communicated his opposition to the BLM protests, which were active throughout the nation at that time. Noble provided the following description of the message he meant to convey: "I didn't care about the protests. And if you're going to protest, that's fine, you have the right to do so, but when you start breaking the law or stopping traffic or destroying property, I don't agree it's a protest anymore. You're violating the law." Noble Dep., R. 11, PageID 413. Whether one agrees with Noble's views or not, there is no question that he spoke to a matter of public concern—namely, whether the alleged violent and destructive tactics of BLM were appropriate means to protest the deaths of George Floyd and others.

That the meme communicated this message in an insensitive manner does not affect this analysis, because "[t]he inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Rankin v. McPherson*, 483 U.S. 378, 387 (1987). For example, in *Rankin*, a public employee responded to an assassination attempt on the life of President Reagan with the remark that "if they go for him again, I hope they get him." *Id.* at 381. That outrageous statement, the Supreme Court held, was a matter of public concern. *Id.* at 386. If advocacy of killing the president can be a matter of public concern, then the meme's depiction of a vehicle running over protestors does not detract from the conclusion that Noble communicated on a matter of public concern as well.

Also consider *Marquardt v. Carlton*, 971 F.3d 546, 548 (6th Cir. 2020) (*Marquardt I*), where we held that a Facebook post dealt with a matter of public concern when it "expressed

satisfaction at" the "killing" of a twelve-year-old Black boy, Tamir Rice, by police. Notwithstanding the highly inappropriate nature of the post, the *Marquardt I* court concluded that its speech addressed a matter of public concern, not a personal grievance. *Id.* at 551. We noted that the plaintiff had spoken through Facebook—a platform designed for disseminating thoughts across a large audience—which further contributed to elevating the speech to a matter of public concern, even though the Facebook account limited the post's visibility to Facebook friends. *Id.* Though Noble's Facebook post arguably was not as offensive as the post in *Marquardt*,[1] that precedent likewise confirms the public nature of his speech.

We therefore conclude that Noble, through reposting the meme on his Facebook page, expressed his views on a matter of public concern.

### B. Noble's Speech Interest Outweighs the Library's Efficiency Interest

Because the speech involved a matter of public concern, we next must apply the *Pickering* balancing test "to determine if the employee's free speech interests outweigh the efficiency interests of the government as employer." *Gillis v. Miller*, 845 F.3d 677, 684 (6th Cir. 2017) (internal quotation marks and citation omitted).

Noble's interest in his speech "receives significant First Amendment weight for two reasons: its general content and the context in which it was made." *Marquardt v. Carlton*, No. 21-3832, 2023 WL 395027, at *3 (6th Cir. Jan. 25, 2023) (*Marquardt II*). As to content, the meme "referenced a high-profile public event," albeit "in [a] distasteful" manner. *Id.* In the aftermath of the police shootings of George Floyd and others, there was nationwide debate over whether the BLM protests were an appropriate response when they resulted in alleged violence, destruction of property, and looting of businesses that had no relationship to the shootings. *See* Skelley, *supra*. The way in which Noble expressed his opposition to BLM may not have been

---

[1]The post in *Marquardt* read as follows: "Let me be the first on record to have the balls to say Tamir Rice should have been shot and I am glad he is dead. I wish I was in the park that day as he terrorized innocent patrons by pointing a gun at them walking around acting bad. I am upset I did not get the chance to kill the criminal fucker." *Marquardt I*, 971 F.3d at 548.

mainstream, but the sentiment that he wished to convey—that the methods of the BLM protests were counterproductive—was by no means an isolated segment of public opinion.

As to context, the Library fired Noble for a post "made on his private Facebook page while he was at home and not working," *id.*, which "raises more First Amendment red flags," *Bennett*, 977 F.3d at 551 (Murphy, J., concurring) (first citing *Garcetti*, 547 U.S. at 419; and then citing *Connick*, 461 U.S. at 153 n.13).  There is no evidence that Noble took his politics to work or that his views on the BLM protests or any other political matter ever interfered with how he performed his job.  To put this in context, consider that the employee in *Rankin* expressed her wish for President Reagan's assassination during the workday.  *Rankin*, 483 U.S. at 381.  Noble, by contrast, was a Switzerland while on the job.

We determine the scope of the Library's interests by considering whether Noble's speech "(1) impairs discipline by superiors or harmony among co-workers, (2) has a detrimental impact on close working relationships for which confidence and personal loyalty are necessary, (3) impedes the performance of [Noble's] duties or interferes with regular operations of the enterprise, or (4) undermines the [Library's] mission." *Marquardt II*, 2023 WL 395027, at *3. "Together, these factors center on the [Library's] effective functioning as a public agency." *Id.* This interest increases "as the speech becomes more controversial." *Bennett*, 977 F.3d at 554 (Murphy, J., concurring) (citing *Rankin*, 483 U.S. at 388).  And Noble's criticism of BLM was very controversial; indeed, it was directly opposite from the political messages on the Library's website.

Weighing these competing interests, we hold that Noble's interest in his speech outweighs the Library's claimed efficiency interest because no evidence indicates that Noble's speech significantly hindered Library operations.  To begin, no member of the public ever complained about Noble's post.  Nor is it likely that the public would have seen the post: Noble kept the meme up for less than a day, his profile settings limited public viewership, and he had few Facebook friends. *See Rankin*, 483 U.S. at 389 (protecting a public employee's speech made privately with another employee, where no evidence suggested that a member of the general public heard the speech).

Granted, Noble's speech was highly distasteful, but the First Amendment protects abhorrent speech, and it does so even if the speech makes others feel quite uncomfortable. *Id.* at 390–92 (concluding that the *Pickering* balance favored an employee's speech that advocated for the assassination of President Reagan); *cf. Snyder v. Phelps*, 562 U.S. 443, 461 (2011) (recognizing that our nation "protect[s] even hurtful speech on public issues to ensure that we do not stifle public debate"). "[T]he proudest boast of our free speech jurisprudence is that we protect the freedom to express the thought that we hate." *Matal v. Tam*, 582 U.S. 218, 246 (2017) (internal quotation marks and citation omitted). So, for example, the Supreme Court held that students had a First Amendment right to wear black arm bands in school to protest the Vietnam War. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 514 (1969). Nothing was said by the *Tinker* Court about protecting the feelings of classmates who may have had relatives in the military serving America in that conflict. Similarly, the Supreme Court has held that the First Amendment protects individuals who refuse to salute the flag, or even burn it, and who engage in homophobic protests at military funerals, despite that such actions deeply offend many people. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943); *Texas v. Johnson*, 491 U.S. 397, 399 (1989); *Snyder*, 562 U.S. at 458. That is because the First Amendment does not permit one side of a debate to use the government to cancel the other side. It allows all perspectives, even the very offensive, to be heard.[2]

A public employer need not wait until an actual disruption to discipline an employee. *Gillis*, 845 F.3d at 687. But its anticipation of disruption must be objectively reasonable. *Bennett*, 977 F.3d at 542–45; *see also Moser v. Las Vegas Metro. Police Dep't*, 984 F.3d 900,

---

[2]To be sure, in the government workplace, there can be limits on political speech. And government employees may have special responsibilities that limit their constitutional rights to speak as freely as the average citizen. But this case does not implicate those limits. For example, Noble used no racial slur like the emergency call center employee in *Bennett*. 977 F.3d at 534. Nor is this case like *Marquardt II*, where the employee's widely publicized and overtly racially charged speech in "the already-bubbling disturbance" enabled the employer to predict that the speech would generate clear controversy. No. 21-3832, 2023 WL 395027, at *4. The speech in *Marquardt II* also directly implicated the employee's role: Marquardt worked as a captain within Cleveland's Emergency Medical Service, which "responded and transported Rice to the hospital." *Id.* at *1. Marquardt's inflammatory speech carried real-world implications to the underlying facts, then, because Marquardt could have played an official hand in the immediate aftermath of the Rice shooting. *Id.* at *4. Conversely, the Library played no official part in responding to the protests (though it issued some public commentary in their support). And, when Noble spoke, no protest had yet occurred in Cincinnati, so his speech did not then carry real-world implications.

907, 910 (9th Cir. 2021) (recognizing that the public employer's interests against disruptions from an employee's "hyperbolic and inappropriate" speech were minimized in part because no media covered the speech and "the chance that the public would have seen the Facebook comment remained low because [the employee] deleted that December 2015 comment by February 2016"); *cf. Johnson*, 491 U.S. at 409 ("[W]e have not permitted the government to assume that every expression of a provocative idea will incite a riot, but have instead required careful consideration of the actual circumstances surrounding such expression[.]").   Without evidence that any member of the public beyond a few Facebook friends saw the meme, the Library could not reasonably anticipate any public backlash against the meme that would disrupt its operations.   And though the Library appeared to argue that it could anticipate that Noble would run over his colleagues or protestors because Noble had access to a Library vehicle as a security guard, the Library did not seriously raise this argument at oral argument.   The Library could not have *reasonably* anticipated that Noble's hyperbolic meme suggested that he would recklessly drive any Library vehicle.   In fact, Noble rarely even drove as part of his job and there is no evidence that he was ever unsafe behind the wheel.[3]

Also, as noted, the Library and some of its employees engaged in the same debate as Noble, although on the opposite side: they publicly supported the BLM movement and attended related protests after Noble shared the meme.   That the Library fired Noble for speech expressing a view contrary to the powers-that-be at that institution casts doubt on its motive for firing him and undercuts its workplace harmony interest.

It is true, as the dissent notes, that we afford the employer wide discretion under *Pickering* balancing.   But still there are limits.   Here, the only injuries that resulted from the speech were the alleged wounded feelings of certain co-workers who had lost trust in him.   But,

---

[3]The dissent suggests that the meme could be read as an allusion to the driver who ran over and killed someone and injured many others at a protest in Charlottesville, Virginia in 2017.  But the record suggests more that Noble was clueless as to such potential meaning than that he had it in mind.  In any event, even if Noble had knowingly alluded to Charlottesville, the motivation behind the meme would have been no more repulsive than that of the protected speech of the worker in *Rankin* who expressed support for President Reagan's assassination soon after an attempt had been made on his life.  483 U.S. at 381.  *Rankin* recognizes a wide parameter of protected speech, even allowing for hyperbole that references deadly violence.  Regardless of how odious this type of metaphorical speech is, it is our duty to enforce the full scope of First Amendment protection in a consistent fashion and without regard to which side of the political aisle is offended by the speech.

given Noble's spotless record as a security guard prior to the meme, there is strong indication that he would have again performed his duties appropriately had he been allowed to retain his job, thus restoring that trust.  Absent evidence that Noble posed a threat or risk to fellow workers, his hyperbolic speech alone was not enough to fire him.[4]  Given the short time Noble kept the meme on his Facebook page, its limited viewership, and the lack of public response, the Library could not have reasonably expected that Noble's post would incite disruption. *Pickering* does not give the Library carte blanche to take away Noble's means of livelihood based on his speech.  The balance favors Noble, not the Library.[5]

## IV

Because Noble's speech enjoys First Amendment protection, we reverse the district court's grant of summary judgment to the defendants.  And because the Library fired Noble because of his protected speech, we remand for the district court to grant summary judgment to Noble on his First Amendment retaliation claim.

---

[4]It's worth emphasizing that Noble reposted the meme before any BLM protest occurred in Cincinnati, so the offended co-workers who attended those protests could not reasonably have concluded that Noble targeted them through the meme.

[5]Contrary to what the dissent suggests, the fact that Noble was a public-facing employee does not alter this analysis.  Again, there is no proof that any patron objected to Noble's meme or even saw it.  But, in any event, it was not a prerequisite to be a security guard at the Library that the guard share the politics of book borrowers or librarians.

———————————

**DISSENT**

———————————

SUTTON, Chief Judge, dissenting.  The *Pickering* line of cases requires us to answer three questions:  (1) Did Noble speak as a private citizen? (2) Did he speak about a matter of public concern? (3) Did his interest in speaking outweigh the library's interest as an employer? *Pickering v. Bd. of Educ. Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968); *Bennett v. Metro. Gov't of Nashville & Davidson Cnty.*, 977 F.3d 530, 537 & n.1 (6th Cir. 2020).  If the answer to all three questions is yes, the First Amendment protects Noble's speech.  No one doubts that Noble spoke as a private citizen.  *Cf. Garcetti v. Ceballos*, 547 U.S. 410, 426 (2006).  And the majority correctly concludes that Noble's post addressed a matter of public concern.  *See City of San Diego v. Roe*, 543 U.S. 77, 83–84 (2004) (per curiam); *Rankin v. McPherson*, 483 U.S. 378, 386 (1987).

The crux of today's case, then, is the third question:  Did Noble's interest in speaking "outweigh" the interests of the library?  This requires us to "balance" Noble's interest in "commenting upon matters of public concern" with the library's interest "as an employer, in promoting the efficiency of the public services it performs." *Pickering*, 391 U.S. at 568.  How to make that call?  "Because of the enormous variety of fact situations" that could arise under this test, as illustrated by this case, the Supreme Court has declined to give specific guidance. *Id.* at 569; *Connick v. Myers*, 461 U.S. 138, 150 (1983).  Deciding whether Noble has a greater interest in commenting on protests or whether the library has a greater interest in managing its workplace leaves us with the ineffable task of "judging whether a particular line is longer than a particular rock is heavy." *Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 897 (1988) (Scalia, J., concurring).  Even if we could strike the right balance between these competing interests, the task would give us the unenviable role of acting like "legislators, not judges." *June Med. Servs. L.L.C. v. Russo*, 591 U.S. 299, 349 (2020) (Roberts, C.J., concurring); *see Bennett*, 977 F.3d at 547–56 (Murphy, J., concurring).

Faced with these push-and-pull vexations, we should preference the concrete over the abstract. In *Bennett*, an emergency call center employee used the n-word in a Facebook comment while discussing the presidential election. 977 F.3d at 533. Even though the employee had an interest in speaking, we held that the employer's interests outweighed it. The comment caused several colleagues to question whether they could rely on the employee to act impartially, and the comment risked damaging the "public perception" of the call center. *Id.* at 540–42. These concerns were especially acute due to the employee's "public-facing role" in fielding emergency calls. *Id.* at 542. In *Marquardt*, likewise, we ruled for an employer who fired an emergency medical service captain after he posted on his private Facebook account that he wished he had killed a twelve-year-old boy shot by police. *Marquardt v. Carlton*, No. 21-3832, 2023 WL 395027, at *3–4 (6th Cir. Jan. 25, 2023). While the employee's interest in speaking "receive[d] significant First Amendment weight," we held that the employer's "interest in preventing the disintegration of public trust" tipped the scales due to the "explosive" reaction to the boy's death. *Id.*

Noble's case presents many of these same dynamics. He posted a meme depicting violence against Black Lives Matter protestors, an image that would invoke for many the horrific attack in Charlottesville a few years earlier. Noble's post also spread beyond his narrow group of Facebook friends, causing considerable dismay among his colleagues. Multiple employees worried that Noble would treat library patrons unfairly, and some expressed hesitation in calling him to respond to public safety concerns, which was precisely Noble's main job. As in *Bennett* and *Marquardt*, Noble's role was public facing, and his actions ran the risk of undermining the public's trust in the library and its staff. True, his speech did not generate precisely the same public relations risk as those cases, but employers need not "allow events to unfold" "before taking action." *Gillis v. Miller*, 845 F.3d 677, 687 (6th Cir. 2017) (quotation omitted). True also, his speech did not create any risk that he would engage in violence on the job. But the library could "reasonably predict" a potential "disruption" given this highly charged political environment and the immediate spreading of Noble's post that had already occurred. *See id.*; *see also Connick*, 461 U.S. at 152; *Marquardt*, 2023 WL 395027, at *4. In such contexts, the

Supreme Court counsels that "a wide degree of deference to the employer's judgment is appropriate." *Connick*, 461 U.S. at 151–52.  Just so here.  I respectfully dissent.