RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0254p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

GPAT PATTERSON, Ph.D.,

                    *Plaintiff-Appellant*,

    *v.*

KENT STATE UNIVERSITY; MANDY MUNRO-STASIUK;
JULIE M. MAZZEI,

                    *Defendants-Appellees*.

> No. 24-3940

─────────────────

Appeal from the United States District Court for the Northern District of Ohio at Akron.
No. 5:22-cv-02052—John R. Adams, District Judge.

Argued: May 7, 2025

Decided and Filed: September 12, 2025

Before: BOGGS, GRIFFIN, and NALBANDIAN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Justin M. Whittaker, WHITTAKER LAW, LL, Cincinnati, Ohio, for Appellant. Daniel James Rudary, BRENNAN MANNA & DIAMOND, LLC, Akron, Ohio, for Appellees. **ON BRIEF:** Justin M. Whittaker, WHITTAKER LAW, LL, Cincinnati, Ohio, for Appellant. Daniel James Rudary, BRENNAN MANNA & DIAMOND, LLC, Akron, Ohio, for Appellees.

─────────────────

## OPINION

─────────────────

NALBANDIAN, Circuit Judge. GPat Patterson, a transgender professor at Kent State University, sued the university on several discrimination and retaliation claims. The claims arise

out of Kent State's response to Patterson's weeks-long, profanity-laden Twitter tirade insulting colleagues and the university.

The district court granted summary judgment for Kent State. We affirm.

## I.

Kent State University is a public university with its main campus in Kent, Ohio, and several regional campuses throughout Ohio. The university has a College of Arts and Sciences, headed by Dean Mandy Munro-Stasiuk.

A few years ago, Kent State began several restructuring efforts. First, it set up a "School of Multidisciplinary Social Sciences and Humanities" within the College to house several academic departments. Second, Kent State started to move its "Center for the Study of Gender and Sexuality" to the new school. The Center's old director had stepped down, and the university put its work on pause. The university wanted to revamp the Center to better fit with other academic programs, and it wanted to coordinate the Center's restructuring with the rollout of a new major in gender studies. Because Dean Munro-Stasiuk expected this process to take a while, she didn't appoint any new director in the meantime.

GPat Patterson is a tenured English professor at Kent State's regional campus in Tuscarawas, Ohio, and identifies as transgender. In early 2021, Patterson contacted Dean Munro-Stasiuk about becoming the Center's new director. The two met and discussed options for the Center's leadership, even though the position wasn't open yet because the Center had gone dormant. Still, the Dean was optimistic about Patterson's potential. While the Center's redesign took place, the Dean decided to propose reallocating some of Patterson's teaching load for the next year, replacing it with work developing the new gender-studies major. After some back and forth, the Dean emailed:

> Here's what I propose for next year. I can buy out some of your time, say 6 credits a semester (50% of your time) to work with the current Women's Studies and LGBTQ Studies faculty to start building out the degree proposal. This will also involve building up the affiliate network which will provide additional courses to the major. Simultaneously, I'd like to build up the center again.

I imagine many of the affiliates associated with the curriculum, will be the same affiliates who would want to be affiliated with the center . . . .

R. 69-7, Emails, p.1, PageID 4228.

They also connected with Julie Mazzei, a political science professor who reports directly to the Dean as head of the School of Multidisciplinary Social Sciences and Humanities. Mazzei then emailed Patterson explaining the coming year's plans for the Center and the major. She cautioned that the Dean's credit-reallocation plan for the fall wasn't set in stone but confirmed that final approval was close. Mazzei noted that as the School's director, she would be chairing the committees designing the gender-studies major and rethinking the gender-studies Center, since the School would house both. And she invited Patterson to join the committees.

Patterson responded and inquired again about the idea of directing the Center. Mazzei answered that the Dean "th[ought] you would be great," but that she wasn't yet sure how the process for hiring a director would go. R. 68-6, Emails, p.1, PageID 4157. The decision didn't rest with Mazzei alone; other administrators would have input, too.

Eventually, Patterson became dissatisfied that Mazzei—not Patterson—would be chairing the committees overseeing the Center and gender-studies major. This dissatisfaction arose from the fact that Mazzei wasn't a gender-studies or sexuality-studies scholar. So during June and July 2021, Patterson took to Twitter to blast Mazzei and Munro-Stasiuk. Here's a sampling of the tweets:

- June 19: Patterson criticized the "two cishet[1] white ladies in charge, with [no] content expertise in this area" (Mazzei and Munro-Stasiuk) and called Mazzei a "usurper." R.73-22, Tweets, p.19, PageID 5004.

- June 23: In response to the idea that insulting colleagues on social media was "unprofessional," Patterson wrote, "No the fuck it isn't." *Id.* at p.15, PageID 5000.

---

[1]Meaning "cisgender, heterosexual" women.

- <u>June 26</u>: "Academia is fundamentally racist, heterosexist, cissexist, ableist, classist & sexist. . . . [B]lock[ing] multimarg[2] faculty from leading is violent." *Id.* at p.13, PageID 4998.

- <u>June 29</u>: Clarifying who the tweets were about, Patterson referred to people "on the main campus" (Munro-Stasiuk and Mazzei) acting in "a kind of trans-lash." "[T]he minute I raise an equity issue, I'm suddenly read as a problem to be neutralized." Patterson also denounced Kent State's "[i]nstitutional transphobia" and "overt trans antagonism." *Id.* at p.10, PageID 4995.

- <u>June 30</u>: "I wish there'd have been a grad practicum called Oh, The Places They'll Go: How to Navigate F*ckery as a Multimarg Faculty Member." Patterson again criticized "the white cishet admin with zero content expertise" who would be leading the new major (Mazzei). *Id.* at p.8, 10, PageID 4993, 4995.

- <u>July 3</u>: "Thanks for coming to my TED talk on how u can claim to be a trans ally all you want, but if you pull sh*t to bar trans ppl's access to life chances, ur still a transphobe. Also, if ur a bystander who watches someone do this mess & don't intervene? Also a transphobe." *Id.* at p.5, PageID 4990.

- <u>July 5</u>: Patterson criticized "individual back-stabbery" and the "horizontal violence . . . [of people in higher education] who see you as competition & want you to fail," and declared that "the whole damn system is killing you a bit more each day." *Id.* at p.4, PageID 4989.

- <u>July 6</u>: "I need you to understand the death-dealing & soul-murdering consequences that result from profoundly privileged administrators not grasping the insidiousness with which inequity & violence show up in multimarg faculty & staff workplaces. Y'all are quite literally killing us." *Id.*

- <u>July 8</u>: "Absolutely zero surprise it's a poli sci prof.[3] Forgive the generalization but that discipline is a sentient trash heap." *Id.* at p.3, PageID 4988

- <u>July 10</u>: "I'd like to talk about the epistemic violence of a university attempting to create a [gender-studies] major, but blocking scholars, with whole PhDs in the discipline, from leading the effort. Please. Tell me another discipline where admins try to pull this shit. I'll wait. 😢" *Id.* at p.1, PageID 4986.

So to sum up, Patterson condemned both Mazzei and Munro-Stasiuk as "transphobe[s]" and "cishet white ladies in charge, with [no] content expertise," engaged in "F*ckery," "shit,"

---

[2]Patterson seems to use this term to signify "multi-marginalized" individuals or those with multiple minority identities.

[3]"Political science"—Mazzei's field.

"trans antagonism," and "epistemic violence" who were "quite literally killing [me]." And Patterson specifically called out Mazzei as a "usurper" and "cishet white admin with zero content expertise" whose field was a "sentient trash heap," and who was guilty of "back-stabbery" and "horizontal violence." Munro-Stasiuk understood these tweets to mean that she and Mazzei, "as heterosexual white females, were incompetent and not otherwise capable of leading the effort to develop the Gender Studies Major and re-imagine the Center." R. 69, Munro-Stasiuk Decl., p.9, PageID 4205.

Around the same time, Patterson also sent several emails and texts to Suzanne Holt (a women's studies professor) and Lauren Vachon (the LGBT studies coordinator). These messages made the same accusations. For example, Patterson texted Vachon that Mazzei was a "white cishetero woman [who] appoint[ed] herself to chair these committees," and told Vachon: "I think you me and Suzanne should be co-chairing both of these committees." R. 56-17, Texts, p.6, PageID 1317. Later, Patterson emailed them that "if [Mazzei] digs in her heels and insists on chairing the [gender-studies major] committee, I'm out completely." R. 56-21, Emails, p.1–2, PageID 1323–24. Holt and Vachon became concerned about these accusations and warned Mazzei, who relayed the red flags to Munro-Stasiuk.

On July 9, as the tweets, texts, and emails built up, Mazzei texted Munro-Stasiuk: "I'm really thinking continuing this is unhealthy for the potential program and school, at this point. It's clearly already having an impact. I have concerns." R. 69-9, Texts, p.15–16, PageID 4244–45. The two had a call to discuss.

The next week, Patterson emailed Munro-Stasiuk, Mazzei, Holt, and Vachon to ask that a planned Friday meeting be cancelled unless another gender-studies professor was invited. Munro-Stasiuk offered to set up a second meeting later, but Patterson refused. So on Friday morning, July 16, Munro-Stasiuk cancelled the meeting.

Munro-Stasiuk had had enough. She realized that things had reached a boiling point. So on the following Monday morning, she sent Patterson an email cancelling the credit load reallocation:

> We . . . need to find a better way to have us all work together.  I believe this will take time.  Thus, for now, I am informing you that I am rescinding my offer to cover 50% of your time in the Fall to work specifically on the creation of [the] Gender Studies major.  You are welcome to be on the committee, to be at the table, and to have [an] equal voice as we work to create the new major.  To be clear, this committee has not yet been formed and we will not reach out to any faculty until they are back on contract at the end of August.

R. 69-16, July 19 Email, p.1, PageID 4269.  Patterson didn't respond—and instead resigned from university service commitments.

At the start of the new fall semester, Mazzei emailed invitations to serve on the faculty committees for the Center and the gender-studies major.  Patterson was invited but didn't respond.  Instead, Patterson kept tweeting, now directing tweets at others, like Vachon, calling her LGBT-studies program "transphobic" and "cis nonsense."  R. 57-16, Emails, p.2, PageID 1605.  Vachon reported the tweets.  She felt "threatened, attacked and bullied" and thought the tweets were "slander and libel against the university." *Id.* at pp.1–2, PageID 1604–05.

In the fall of 2021, Patterson also requested a tenure transfer from Kent State's Tuscarawas campus to the English department on the main campus.  Tenure transfers must be approved by two committees at the receiving campus (here, Kent State's main campus)—the Faculty Advisory Committee (FAC) and the Reappointment, Tenure, and Promotion (RTP) Committee.  So the two committees met.  The RTP members discussed Patterson's withdrawal from university service, negative interactions with other faculty members, and the department's needs.  No one discussed Patterson's gender identity.  The committee then voted against the transfer request 12 to 2 (with one abstention).  The FAC adopted the results of that vote.

Dean Munro-Stasiuk asked the English department chair, Babacar M'Baye, to convene the committees again because of a procedural irregularity—under university policy, each committee was supposed to vote separately.  So he did.  Another English professor, Robert Trogdon, also approached M'Baye to raise concerns that the committees hadn't sufficiently discussed Professor Patterson's scholarship, teaching, and service.

The committees met and voted again, this time following proper procedure.  The RTP Committee voted against the transfer request 10 to 3 (with three abstentions).  The FAC voted

against the transfer request 7 to 0 (with one abstention).  So Patterson's application to switch campuses was denied.

Patterson later sued Kent State, Munro-Stasiuk, and Mazzei for claims of (1) sex discrimination under Title VII, (2) retaliation under Title VII, (3) First Amendment retaliation under 42 U.S.C. § 1983, and (4) perceived-disability discrimination under the Rehabilitation Act.[4]  The district court granted summary judgment for the defendants.  Patterson appealed.[5]

## II.

When "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," a district court grants summary judgment.  Fed. R. Civ. P. 56(a).  We review summary-judgment grants de novo.  *Walden v. Gen. Elec. Int'l, Inc.*, 119 F.4th 1049, 1056–57 (6th Cir. 2024).  We draw all reasonable inferences for the nonmoving party, but we won't accept mere conjecture and speculation.  *Id.*  To get past summary judgment, the nonmoving party "must present significant probative evidence putting the material facts in doubt."  *Id.* (internal quotation marks omitted).  And when a district court grants summary judgment, we can affirm on any ground supported by the record and raised below.  *M.J. ex rel. S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 451 (6th Cir. 2021).

## III.

### A.

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation,

---

[4]The operative complaint raised due-process and equal-protection claims, too.  But the district court found them abandoned at summary judgment, and Patterson doesn't raise them again on appeal.

[5]After summary-judgment briefing closed, Patterson filed a late "motion to strike" Dean Munro-Stasiuk's declaration under the sham-affidavit rule, arguing that the declaration contradicted the Dean's deposition.  The district court denied the motion.  Patterson has nominally appealed that ruling, but does not develop any argument as to why we should reverse.  And on our own review we do not find any inconsistency or sham fact issue.  So the motion was untimely raised, the issue is forfeited here, and it lacks merit anyway.  We affirm the district court's ruling.  *See Walden v. Gen. Elec. Int'l, Inc.*, 119 F.4th 1049, 1057 n.3 (6th Cir. 2024); *see also Island Creek Coal Co. v. Maynard ex rel. Maynard*, 87 F.4th 802, 814–15 (6th Cir. 2023) (noting that parties cannot incorporate by reference arguments made in district court briefing).

terms, conditions, or privileges of employment, because of" that individual's "sex." 42 U.S.C. § 2000e-2(a)(1). Under *Bostock v. Clayton County*, sex discrimination includes discrimination on the basis of transgender identity. 590 U.S. 644, 683 (2020).

Plaintiffs can prove discrimination with either direct or circumstantial evidence. Direct evidence "consists of facts that, if believed, require the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 302 (6th Cir. 2016) (cleaned up). No inferences or logical jumps are needed. Circumstantial evidence, by contrast, is indirect evidence that gives rise to an inference of discrimination; it suggests, but does not require, the conclusion that discrimination occurred.

**B.**

Patterson first argues that the tenure-transfer rejection is direct evidence of discrimination. It's not. At face value, nothing about the rejection requires the conclusion that the committees voted against the transfer because of Patterson's transgender identity. One would have to *infer* that they did, since the only evidence shows that nobody at the meetings discussed Patterson's transgender identity. Rejecting the application of a transgender professor is not direct evidence that the application was denied *because* the professor is transgender.

Patterson also points to the committees' discussion of whether the English department needed more faculty with backgrounds in LGBT studies, claiming that this is direct evidence of discrimination. That argument conflates a professor's scholarly discipline with a professor's personal traits. *See Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 450–51 (2d Cir. 1999). An Italian person may offer to teach Italian classes, but if a university doesn't need more Italian classes, that's not direct evidence of animus against Italian *people*. So there's no direct evidence of discrimination.

**C.**

A plaintiff can also show discrimination with circumstantial evidence, which we generally analyze under the *McDonnell Douglas* framework. *McNeal v. City of Blue Ash*, 117 F.4th 887, 895 (6th Cir. 2024) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–06

(1973)).  We walk through several steps.  First, a plaintiff must make out a prima facie case of discrimination—he must (1) be in a protected class, (2) suffer an adverse employment action, (3) qualify for the responsibilities sought, and (4) be treated differently than someone similarly situated but not in his protected class.  *Id.*  Then, assuming he does so, the defendant must identify a legitimate, nondiscriminatory reason for its actions.  *Id.*  Finally, if the defendant succeeds, then the burden shifts back to the plaintiff to offer evidence that the employer's justification is pretextual.  *Id.*

**1.**

At the prima facie stage, the parties mainly dispute whether Kent State took an "adverse employment action" against Patterson.  Patterson identifies three possibilities: (1) the Dean revoking her offer to lighten Patterson's credit load, (2) the Dean's "[r]evocation" of Patterson's leadership role in the Center, and (3) the English department's denial of the tenure-transfer request.  Appellant Br. at 24.

For decades, most circuits held that a plaintiff must show some sort of "significant" harm to establish an adverse employment action.  *See Muldrow v. City of St. Louis*, 601 U.S. 346, 353 n.1 (2024) (collecting cases); *see, e.g.*, *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014).  But the Supreme Court has since rejected any heightened-showing rule as inconsistent with the text of Title VII, which simply prohibits discrimination on the basis of sex. *See Muldrow*, 601 U.S. at 350.  The employer's action need not cause significant or seriously detrimental harm; it need only cause some "disadvantageous change in an employment term or condition."  *Id.* at 354 (internal quotation marks omitted).  The plaintiff need only "show some harm."  *Id.* at 350.

The district court below dismissed Patterson's position under the old test, reasoning that Kent State's actions weren't materially adverse.  In light of *Muldrow*, the district court applied the wrong standard.  Under *Muldrow*, perhaps some of Kent State's decisions could constitute

adverse actions. Others probably don't.**6** But because Patterson's claim fails at the pretext stage, we assume without deciding that the claim passes the prima facie stage.**7**

**2.**

Kent State had legitimate, nondiscriminatory reasons for what it did. Patterson sent rude and profanity-laced tweets, emails, and texts insulting Munro-Stasiuk and Mazzei, including disparaging references to their race, sex, and occupations. Those messages violated university policy against attacking colleagues or their academic fields. And they easily provided reasonable grounds—having nothing do to with sex or gender—for disciplining or reprimanding an employee. *Hoffman v. Pro. Med Team*, 394 F.3d 414, 421 (6th Cir. 2005) (employee using profanity toward a supervisor); *Gribcheck v. Runyon*, 245 F.3d 547, 551–52 (6th Cir. 2001) (employee being "disrespectful and discourteous" to others); *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1082 (6th Cir. 1994) (employee's "obnoxious" and "confrontational" manner toward supervisors and colleagues).

Kent State also had legitimate reasons to deny the campus tenure-transfer application. The evidence shows that Patterson's lack of collegiality and decision to quit university service committees played a part. The classes Patterson wanted to teach also didn't fit with the main-campus English department's curriculum and needs at that time. And the department wanted to preserve its ability to hire a new tenure-track professor the next year; it worried that a lateral hire from a regional campus would use up that spot. This is standard stuff for tenure decisions.

---

**6**For example, the opening brief insists that Kent State "awarded a prestigious leadership position" to Patterson, only to "revoke[]" it and "relegate[]" Patterson to "mere 'participation' in the Center." Appellant Br. at 26; *see also id.* at 24 (discussing "Revocation of Dr. Patterson's Leadership Role in the Center"). The record does not bear that claim out. Kent State didn't revoke anyone's position because Kent State never appointed anyone to the Center. The evidence shows that the director position simply hadn't opened yet. Thus, no adverse action. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 n.44 (1977) (discrimination claim fails if there's no "vacancy in the job sought"); *Valent v. Summers*, 208 F.3d 216 (6th Cir. 2000) (table) (noting that a plaintiff "could not have suffered an adverse employment decision . . . if there were no positions available"). While the Dean said she'd *consider* Patterson for the job, she didn't make any promises. Even Patterson described the Dean's position this way: "We talked about the center, too, but she wanted to think over what she wanted to do. There[ wa]s a possibility I might direct it." R. 59-1, Emails, p.1, PageID 1958.

**7**We thus do not address what precise quantum of harm *Muldrow* requires. We also do not decide whether our decision in *Threat v. City of Cleveland* survives *Muldrow*. *See* 6 F.4th 672, 678 (6th Cir. 2021) (noting the "de minimis exception that forms the backdrop of all laws").

*See Webb v. Ky. State Univ.*, 468 F. App'x 515 (6th Cir. 2012) (table) (lack of service to university community); *Maras v. Curators of Univ. of Mo.*, 983 F.3d 1023, 1028 (8th Cir. 2020) (discussing "overall fit in a department's or university's educational regime" as "quintessentially the type of academic [tenure] decisions that courts should respect").

**3.**

So Kent State has shown that it had good reason for its actions.  Has Patterson offered any evidence that Kent State used these justifications as pretext for sex discrimination?

No.  A plaintiff can establish pretext in several ways, such as by showing that the defendant's articulated reasons had no factual basis, didn't in fact motivate the action, or could not warrant the action taken.  *McNeal*, 117 F.4th at 895.  But there's no evidence here to support any of those theories.

Kent State's decisions had ample basis in fact.  The record contains many disparaging tweets, emails, and texts, which led to a toxic work environment.  And that factual basis was more than enough to warrant some kind of response.  Munro-Stasiuk and Mazzei were both originally excited to work with Patterson.  They only changed course after the hostile tweets and texts.

The tenure-transfer rejection likewise bears no indicia of pretext.  The same English department had voted to unanimously to *grant* Patterson tenure less than a year before.  If the committee members were biased against transgender people, wouldn't they have shown it then?  What's more, after the committees voted "no" on the first transfer vote, Munro-Stasiuk realized that they hadn't followed the right procedures.  So she had them vote again.  If she was biased, why not just leave the "no" vote at that?  Why erase the vote and give Patterson another shot?  No evidence suggests that Kent State's true motivation was animus against anyone's sex or gender identity.

We affirm summary judgment on the sex-discrimination claim.

**IV.**

**A.**

Title VII also makes it unlawful for an employer to discriminate against an employee "because he has opposed any [discriminatory] practice." 42 U.S.C. § 2000e-3(a). Patterson again relies on indirect evidence, so we again walk through the *McDonnell Douglas* steps.

A plaintiff must first establish a prima facie case. He does so by showing that (1) he engaged in activity protected by Title VII, (2) the defendant knew of his protected activity, (3) the defendant took materially adverse action against him,[8] and (4) some causal link connected the protected activity and the materially adverse action. *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 613 (6th Cir. 2019). If the plaintiff does so, the employer must then offer a legitimate, nondiscriminatory reason for its actions. *Id.* Then, the burden shifts back to the plaintiff to offer evidence of pretext. *Id.* at 614.

Reporting or protesting discriminatory practices in the workplace counts as "protected activity" under Title VII. *Id.* at 613. Patterson claims to have engaged in this kind of activity, citing four emails.

First, an email to a university official, Amoaba Gooden, in which Patterson resigned as a university DEI representative and complained that Kent State wasn't a "safe or welcoming place for trans faculty." R. 57-12, PageID 1599. Second, an email to Professor M'Baye, the English department chair, in which Patterson stepped back from service on a university "DEI Strategic Planning Process." R. 57-14, PageID 1601. Third, an email to Kathy Davis-Patterson, another faculty member, in which Patterson reported on "inequity" and "transphobes" at Kent State. R. 82-10, PageID 5279. Fourth, an email to Deb Smith, who worked with the faculty union. In this email, Patterson resigned as a union representative, citing "inequity and discrimination in the workplace" at Kent State. R. 57-13, PageID 1600.

---

[8]The Supreme Court has read Title VII's anti-retaliation provision to require a "materially adverse" action for reasons peculiar to the retaliation context. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–70 (2006). The Court in *Muldrow* found those reasons lacking in the discrimination context, and so declined to adopt the "materially adverse" standard there. But the Court did not displace that standard for retaliation claims. *See Muldrow*, 601 U.S. at 357–58.

We have three alleged retaliatory actions on the table: the (non-)decision over the Center's leadership, the Dean's offer revocation, and the English department votes. None pass the prima facie stage.

**B.**

**1.**

First, the Center's leadership. As discussed above, Kent State took no adverse action here because it took *no* action. *See supra* n.6. The record reveals that the university simply wasn't hiring for the director position. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 358 n.44 (1977); *Valent v. Summers*, 208 F.3d 216 (6th Cir. 2000) (table).

**2.**

Second, the offer revocation. Patterson sent three of the four emails (Gooden, M'Baye, and Smith) *after* the Dean yanked her offer in July 2021. The emails responded to the Dean's decision. So as a matter of logic, these emails couldn't have caused the Dean to pull her offer; it's the other way around. That leaves the Davis-Patterson email (sent in June 2021 before the revocation). Even if it were protected activity, it flunks the "defendant's knowledge" prong of the prima facie test. As the key decisionmaker, the Dean couldn't have retaliated against Patterson because of the email if she didn't know about it. Patterson has offered the email as evidence but has offered no evidence that Munro-Stasiuk (or anyone else) *knew* of these emails. And why would they? It was a private message. No evidence points to any forwarding, copying, or reporting on its contents. So no evidence suggests the Dean acted retaliatorily.

**3.**

Third, the English department votes. Again, each email fails to clear the prima facie test. Start with the M'Baye email. Patterson wrote M'Baye to quit a university committee and offered as a justification: "I'm facing some health issues right now. . . . I do not have the bandwidth to fill [the role] with the energy it deserves." R. 57-14, PageID 1601. This email did not raise any issue implicating sex discrimination. It merely mentioned Patterson's health. It thus wasn't protected activity under Title VII. *See Goldblum v. Univ. of Cincinnati*, 62 F.4th 244, 252–53

(6th Cir. 2023) ("[Plaintiff's] letter wasn't protected activity because it didn't complain of sex discrimination.").

As for the other three emails (Gooden, Davis-Patterson, and Smith), Patterson offers no evidence that any decisionmaker in the English department knew about them. And if the English faculty had no idea these emails existed, they couldn't have been the basis for retaliation.

We affirm summary judgment on the retaliation claim.

**V.**

**A.**

Patterson also sued Munro-Stasiuk and Mazzei in their individual capacities for First Amendment retaliation under 42 U.S.C. § 1983. On appeal, Patterson presses this claim only as to Munro-Stasiuk. This claim concerns the Twitter tirade, and whether the First Amendment protects it.

To succeed on a First Amendment retaliation claim, a plaintiff must show that (1) he engaged in protected speech, (2) he suffered an adverse action that would deter a person of ordinary firmness from persevering in that conduct, and (3) the action was at least partially motivated by the protected conduct. *Noble v. Cincinnati & Hamilton Cnty. Pub. Library*, 112 F.4th 373, 380 (6th Cir. 2024).

For public employees, the "protected speech" prong has three parts. The plaintiff must have spoken as a private citizen, the speech must address a matter of public concern, and the plaintiff's interests in speaking on those matters must outweigh the state's interest in promoting effective and efficient public services. *Id.* at 381. The first step isn't in dispute here; it's the second two that matter.

Speech involves a matter of public concern when it deals with "any matter of political, social, or other concern to the community." *Myers v. City of Centerville*, 41 F.4th 746, 760 (6th Cir. 2022) (internal quotation marks omitted); *see Connick v. Myers*, 461 U.S. 138, 146 (1983). "The linchpin of the inquiry is . . . the extent to which the speech advances an idea transcending personal interest or opinion" and instead impacts our shared social or political life. *Meriwether*

*v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021) (internal quotation marks omitted).  Allegations of public corruption, for example, touch on matters of public concern.  *Myers*, 41 F.4th at 760.  So do remarks about government inefficiency or major government policy decisions.  *Id.* at 760–61. And so do statements exposing governmental discrimination.  *See id.* at 761.

On the other hand, speech about internal personnel disputes or management doesn't cut it.  *See id.*  Run-of-the-mill "employee beef" doesn't implicate the public concern just because it's been spilled to the public.  *Id.* (citation modified).  That's because "the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs."  *Connick*, 461 U.S. at 149.  The government, as an employer, must "enjoy wide latitude in managing [its] offices, without intrusive oversight by the judiciary in the name of the First Amendment."  *Id.* at 146.  Put simply, "complaining about your boss and coworkers is not protected by the First Amendment just because you work for the government."  *Feterle v. Chowdhury*, 148 F. App'x 524, 533 (6th Cir. 2005) (per curiam).

**B.**

Patterson's tweets didn't involve a matter of public concern.  The gist of the month-long diatribe was to complain about Munro-Stasiuk's and Mazzei's decisions on how to handle new academic programming.  Munro-Stasiuk and Mazzei were repeatedly called out as "cishet white admin ladies" engaged in "F*ckery," "shit," "trans antagonism," and "epistemic violence" who were "quite literally killing [Patterson]."  Mazzei was singled out as a "usurper" and "cishet white admin with zero content expertise" whose field of study was a "sentient trash heap," and who was guilty of "back-stabbery" and "horizontal violence."  These are complaints about other Kent State faculty members and their workplace decisions—"employee beef," plain and simple. *Myers*, 41 F.4th at 761 (internal quotation marks omitted).

The tweets are insulting, disparaging, and targeted.  They use profanities, and they describe Munro-Stasiuk and Mazzei in terms of their race and sex.  Complaining about and insulting your coworkers simply doesn't implicate a matter of public concern.  *See id.*; *see also Latham v. Office of Att'y Gen. of State of Ohio*, 395 F.3d 261, 266 (6th Cir. 2005); *Mitchell v. Hillsborough County*, 468 F.3d 1276, 1288 (11th Cir. 2006).

Patterson frames the tweets as publicizing Kent State's alleged transphobia and exposing discrimination in the workplace. In fairness, a few tweets do make more general references that sound less like targeted insults. For example, one tweet states: "Academia is fundamentally racist, heterosexist, cissexist, ableist, classist & sexist." R.73-22, Tweets, p.13, PageID 4998. In isolation, perhaps that qualifies as protected speech. *See Boulton v. Swanson*, 795 F.3d 526, 532 (6th Cir. 2015). But the tweet is swarmed on either side by other attacks on Munro-Stasiuk and Mazzei. Indeed, that same tweet's very next sentence accuses Professor Mazzei of "violen[ce]." R.73-22, Tweets, p.13, PageID 4998. A public employee can't blend protected speech with "caustic personal attacks against colleagues," and then use the protected speech to immunize those attacks. *Dunn v. Carroll*, 40 F.3d 287, 293 (8th Cir. 1994) (internal quotation marks omitted).

And even if the tweets did involve a matter of public concern, they still wouldn't receive protection. Kent State's interest as an employer in administering effective public services outweighs Patterson's interest in this kind of trash talk. *See Noble*, 112 F.4th at 381.

There's a way to raise awareness of discrimination without engaging in profanity-laced and race- and sex-based aspersions against colleagues. The tweets created serious strife within the Kent State community, causing Munro-Stasiuk and Mazzei to feel harassed and insulted. And it led to a dysfunctional work environment for several months. Mazzei had to text Munro-Stasiuk, for example: "I'm really thinking continuing [having Patterson involved] is unhealthy for the potential program and school, at this point. It's clearly already having an impact. I have concerns." R. 69-9, Texts, p.15–16, PageID 4244–45. Munro-Stasiuk also testified to how noxious things had gotten. "The foundation of [revoking the offer]," she stated, "was the toxic, hostile tweets that Dr. Patterson had been posting over the course of over a month . . . . [I]t was escalating, continually targeting [Mazzei], in particular, continually targeting Lauren Vachon and Suzanne Holt, to a certain extent myself." R. 73, Munro-Stasiuk Dep., p.88–89, PageID 4809–10. The Dean discussed how Patterson had "show[n] over, and over, and over again" a refusal to be collaborative or respectful and was "completely trying to undermine the process." *Id.* at p.89, PageID 4810. In short, Patterson had compromised any "ability to lead any initiative" and any "ability to work in the Center, or the [major.]" *Id.*

Kent State's business is educating students. When an employee seriously undercuts the university's power to do its basic job, the Constitution doesn't elevate the employee over the public that Kent State exists to serve.

All told, "[t]he First Amendment does not require a public employer to tolerate an embarrassing, vulgar, vituperative, ad hominem attack, even if such an attack touches on a matter of public concern." *Mitchell*, 468 F.3d at 1288 (internal quotation marks omitted). When "the manner and content of an employee's speech is disrespectful, demeaning, rude, and insulting, and is perceived that way in the workplace, the government employer is within its discretion to take disciplinary action." *Id.* (internal quotation marks omitted).

We affirm summary judgment on the First Amendment retaliation claim.

**VI.**

**A.**

Patterson also brings a disability-discrimination claim. Under Section 504 of the Rehabilitation Act, certain public universities cannot discriminate against someone "solely by reason of her or his disability." 29 U.S.C. § 794(a). Once again, we apply *McDonnell Douglas*. With indirect evidence, a plaintiff must first make out a prima facie case of discrimination. *Bledsoe v. Tenn. Valley Auth. Bd. of Dirs.*, 42 F.4th 568, 581 (6th Cir. 2022). If he does so, the employer must respond with a legitimate, nondiscriminatory reason for its action. Then, the plaintiff must furnish evidence that the employer's reason is merely pretextual. *Id.*

For a prima facie case under Section 504, the plaintiff must show that (1) he is disabled, (2) he is otherwise qualified for the job, with or without reasonable accommodation, (3) he suffered an adverse employment action, (4) his employer knew or should have known about the disability, and (5) a nondisabled person was treated more favorably or the sought-after position remained open. *Id.* at 578. The Rehabilitation Act borrows the disability standards of the Americans with Disabilities Act (ADA), *see* 29 U.S.C. § 794(d), and under the ADA, a plaintiff can sue if his employer regards him as disabled (even if he is not disabled), *see* 42 U.S.C. § 12102(1).

To show a perceived disability under the ADA (and thus the Rehabilitation Act), a plaintiff must prove that his employer "regarded" him as having a "physical or mental impairment that substantially limits one of more major life activities" and is expected to last (or actually lasts) more than six months. 42 U.S.C. § 12102(1), (3); *see Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 321 (6th Cir. 2012).

**B.**

Patterson has established no perceived disability, and the claim thus fails at the prima facie stage. The disability claim rests on one stray remark that Professor Holt made to Mazzei. Recall that Patterson sent several messages to Holt and Lauren Vachon venting at Mazzei; Holt and Vachon then became worried about whether they could work with Patterson. In her deposition, Mazzei recalled Holt saying "that she [Holt] had very deep concerns about Dr. Patterson's stability, mental stability, and that the communications were spiraling downward." R. 64, Mazzei Dep., p.124, PageID 3193. Patterson points to this "mental instability" reference to invoke the disability protections of the Rehabilitation Act.

This isolated comment is not the kind of evidence that courts have found satisfies the "regarded as disabled" definition. "Personality conflicts among coworkers (even those expressed through the use (or misuse) of mental health terminology) generally do not establish a perceived impairment on the part of the employer." *Lanman v. Johnson County*, 393 F.3d 1151, 1157 (10th Cir. 2004). Holt's remark simply expressed her concern about Patterson's uncollegial and unprofessional attitude. At most, it is a "mere scintilla" of evidence—insufficient to survive summary judgment. *Bruzzese v. Sessions*, 725 F. App'x 68, 72 (2d Cir. 2018) (table) (comment about plaintiff's "mental and emotional stability" didn't show perceived disability*); see also Lanman*, 393 F.3d at 1157 ("comments by non-supervisory co-workers about [plaintiff's] mental health" are insufficient); *Kvintus v. R.L. Polk & Co.*, 3 F. Supp. 2d 788, 795–96 (E.D. Mich. 1998) (comments that plaintiff was "delusional," "erratic," and "dysfunctional" are insufficient), *aff'd*, 194 F.3d 1313 (6th Cir. 1999) (table) (per curiam).

With no perceived disability, the perceived-disability claim fails.  We affirm summary judgment on the Rehabilitation Act claim.

**VII.**

For these reasons, we affirm.